526 So.2d 315 (1988)
Bertha P. THORNTON, et al., Plaintiffs-Appellants,
v.
THORNTON FARMS, INC., Defendant-Appellee.
No. 87-297.
Court of Appeal of Louisiana, Third Circuit.
May 11, 1988.
Rehearing Denied June 21, 1988.
*316 Patrick F. McGrew, Baton Rouge, for plaintiffs-appellants.
Sessions, Fishman, Rosenson, Boisfontaine & Nathan, Max Nathan, Jr., Anthony Dunbar, New Orleans, for defendant-appellee.
Before DOMENGEAUX and GUIDRY, JJ., and REGGIE,[*] J. Pro Tem.
EDMUND M. REGGIE, Judge Pro Tem.
The issue on appeal is whether good title and ownership of improperly issued corporate stock may thereafter be acquired by either three or ten year acquisitive prescription and who bears the burden of proof in an action on the alleged impropriety of the stock issuance.

FACTS
Thornton Farms, Inc., a family farm business, was organized by the father, Albert A. Thornton, Sr., (Albert, Sr.), who was issued 104 shares of stock; one son, Albert A. Thornton, Jr. (Albert, Jr.), was issued 18 shares, and the other son, J.H. Thornton, Sr. (J.H.), was issued 64 shares. Authorized to issue 500 shares of $100.00 par share, the corporation issued a total of 186 shares at organization. Prior to June 21, 1965, a controversy arose among the shareholders over use of corporate finances. J.H. was allegedly drinking heavily and it was said he had been indiscreet with certain oil lease payments to the corporation. A directors' meeting took place on July 21, 1965. J.H. did not attend the meeting. Albert, Jr. replaced his brother, J.H., as secretary-treasurer of the corporation. Their father, Albert, Sr., remained President. The directors provided resolutions *317 that authorized two signatures on all checks and official documents of the corporation and that the new secretary-treasurer would investigate the oil leases and proceeds distribution from those leases. It was at that same meeting of July 21, 1965 that Albert, Jr. received certificate no. 4 representing 46 shares of stock in the corporation. That stock issuance brought the total of stock issued by the corporation up from 186 shares to 232 shares. This suit concerns the ownership of certificate no. 4 and the 46 shares of stock it represents. The signatures on the stock certificate are those of Albert, Sr. and Albert, Jr. and their genuineness is not contested nor is the regularity of that directors' meeting in question.
Notations made on the July 21, 1965 directors' meeting minutes appear to calculate the dollar value of the 46 shares at par value of $100.00, or $4,600.00 plus the cost of documentary stamps to be affixed to the certificate in connection with its issuance in the sum of $5.06.
The next year, 1966, J.H. became delinquent on a note to Calcasieu Marine National Bank in Lake Charles and J.H. agreed to pledge his stock in Thornton Farms, Inc. as security for his restructured bank loan. In connection with his restructured loan, J.H. signed an authentic act to the bank in which he attested to the corporation having issued and outstanding 232 shares of stock. In fact, that affidavit was signed by all three shareholders, Albert, Sr., Albert, Jr., and J. H.
Albert, Sr. was an accountant by training and he kept the corporation's books. After his death, those corporation books disappeared and were not produced at trial. Their disappearance occurred during J.H.'s operation of the corporation after his father's death.
The only existing financial records of the corporation that were produced at trial were the federal and state income tax returns for the period 1965 to 1971. Those tax records show the outstanding issued stock to be valued at $23,200.00, which equates 232 shares at $100.00 par value. On two of those returns the ownership of each stockholder was indicated. It showed A. A. Thornton, Sr. owned 45%; J.H. Thornton owned 27%; and A. A. Thornton, Jr. owned 28%. These ownership percentages reflect ownership if Albert, Jr. is granted ownership of certificate no. 4 for 46 shares.
On November 3, 1971, Albert, Sr. died and the next day, his son, Albert, Jr., died. J.H. then took over the management of the farm.
After her husband died, Mrs. Albert A. Thornton, Jr. was going through her deceased husband's desk and found Thornton Farms, Inc. certificate no. 4 representing 46 shares issued to the name of her husband. She presented it to J.H. who declined to recognize it. She nonetheless included it in the Sworn and Descriptive List of Assets in Albert, Jr.'s succession and it was included in the Judgment of Possession. She paid the federal estate tax on the value of the stock.
To file the first income tax return for the corporation since he took over the management of the farm, J.H. employed McElroy & Quirk, an accounting firm, to prepare the corporation's income tax return. In the information he gave the accountants, J.H. reduced the capital stock from the $23,200.00 figure used in the immediate prior years when his father attended to the tax preparations, to $18,600.00, the figure used before the issuance of certificate no. 4 for 46 shares.
Although certificate no. 4 was spoken about among the families, nothing definitive occurred concerning it since no dividends were paid by the corporation until 1978 and exact ownership was not an issue prior to dividend date. The one surviving sibling of J.H., Dorothy Thornton Yerger, attempted to get the widow of her deceased brother, Albert, Jr. to forego a dispute with J.H.
When the dividends were paid, the checks did not indicate the number of shares represented by the dividend.
In 1983, the parties attempted to settle among themselves the dispute concerning corporate stock ownership percentages so *318 they could lease the land for oil and gas and divide the lease money according to a mutual understanding among them. The amicable agreement failed to materialize. By then J.H. had died.
In 1984, the heirs of J.H. filed a petition for mandamus and declaratory judgment against the corporation seeking to declare certificate no. 4 invalid. Albert, Jr.'s heirs joined as defendants and they contend that plaintiffs own 98.668 shares, defendants own 98.668 shares and the surviving sibling of the two deceased brothers, Dorothy Thornton Yerger, owns 34.667 shares for a total of 232 outstanding and issued shares in Thornton Farms, Inc.
After trial, on September 23, 1986, the trial court ruled that certificate no. 4 had been issued without consideration, but was acquired by Albert, Jr. and his heirs by three year or ten year acquisitive prescription based on the nineteen years that lapsed since its issuance. The plaintiffs appeal. The individual defendants respond to the appeal and state their agreement with the trial court's ultimate ruling recognizing certificate no. 4, but that the court should also have reached the conclusion that the certificate is presumptively valid, because the plaintiffs failed to carry their burden of proving that it was invalidly issued, and because the plaintiffs' claims are barred by estoppel and prescription.

THE LAW
Plaintiffs contend that the constitutional prohibitions against corporate stock issuance without consideration is an absolute nullity and is therefore not susceptible to acquisitive prescription.
Before we deal with that issue, we address the matter of whether consideration was, in fact, paid by Albert, Jr. for the 46 shares represented by certificate no. 4. And, to do that, we must look to the record of the trial court and ascertain the proof of payment or nonpayment and who bears the burden of proving payment or nonpayment.
The jurisprudence has long been settled in Louisiana that contracts and other acts of parties are presumed legal. "Hence, when one party charges that a contract is infected with an illegal intent, the burden of proof is imposed upon him to establish this allegation." Conner & Hare v. Robertson, 37 La.Ann. 814 (1885).
This court has ruled in Smith v. Smith, 311 So.2d 514, 524 (La.App. 3 Cir.1974), writ denied, 313 So.2d 840 (La.1975):
"... A certificate of stock serves as prima facie evidence that the person to whom the certificate is issued is the owner of that stock.... The issuance of a certificate of stock by a corporation is a declaration by that company that the person in whose name the certificate is made out is a shareholder in the company." (Citations omitted.)
It is then the burden of the plaintiffs to prove that certificate no. 4 was issued by Thornton Farms, Inc. for no consideration.
Plaintiffs' only witness in this regard was Mrs. Kathleen Van Haverbeke, the daughter of J.H. She testified that she saw the books of the corporation prior to 1972 and that she saw the "capital page" which showed the value of the corporation's capital to be $18,600.00, representing 186 shares issued at $100.00 par value per share. Of course, the books to which she makes reference have disappeared and there is no corroboration of her testimony. What evidence we have indicates something else.
There is uncontested evidence that the state and federal income taxes filed by Albert, Sr. between 1965 and 1971 all showed the capital to be $23,200.00 representing 232 shares with a par value of $100.00 per share. Mrs. Van Haverbeke testified that all of those income tax returns were prepared by her grandfather, a professional bookkeeper. Those annual income tax returns constitute our only corporation records for the period following the date of certificate no. 4, July 21, 1965 until 1972 when J.H. took over the management of the farm. In 1972, the income tax returns showed a reduced capital account from $23,200.00 back to $18,600.00 that prevailed prior to the issuance of certificate no. 4 for 46 shares. The outside accountant *319 testified the reduced capital figure was supplied by J.H.
Furthermore, we must recognize that when J.H.'s bank loan was restructured at Calcasieu Marine National Bank, an affidavit was filed by all three stockholders, Albert, Sr., J.H. and Albert, Jr., stating that there were 232 shares of stock issued, of which 64 shares were owned by J.H. The affidavit was signed before a Notary and two witnesses on July 22, 1966. The Notary, John Camp, was an attorney for the bank and his deposition testimony indicates he was very careful in preparing the affidavit showing the correct number of shares issued to the three stockholders. He testified that he examined each stockholder individually and all three stated that the percentages were in an amount which included and recognized certificate no. 4 in the sum of 46 shares to Albert, Jr. No purpose could have been served for J.H. to agree with those figures if they were not correct. His loan did not depend on any particular number of shares being owned by the stockholders other than his own which were being pledged to the bank. No factor we know forced J.H. to sign the affidavit showing Albert, Jr.'s shares to include the 46 shares represented by certificate no. 4.
In Davidson v. American Paper Manufacturing Co., 188 La. 69, 175 So. 753, 760 (1937), the Louisiana Supreme Court considered an attack against a corporation stockholder's right to ownership of stock. The court said, "Under such circumstances the defendants who now seek to set aside these transactions (after the named stockholder died) have assumed a heavy burden."
It is our opinion in the case sub judice that those who attack the validity of ownership under certificate no. 4 for 46 shares have the burden to prove that no consideration was paid, either in money, labor or property by Albert, Jr. The trial court erred in not placing the burden on the plaintiffs who challenge the validity of the certificate. It must be their burden to carry.
Moreover, we find it quite plausible that Albert, Jr. was issued the stock for labor performed over the years, constituting compensation for the stock. The record shows he lived on the farm and actually planted and cultivated crops. On the other hand, J. H., during the same period, was totally away from the farm and performed no duties or labor for the corporation.
We think it is significant that the salaries of J. H. and Albert, Jr. were widely different as was their stock ownership prior to 1965, when the disputed shares were issued. Thereafter, they both drew identical salaries when they owned substantially equal shares in the corporation if certificate no. 4 is considered owned by Albert, Jr.
Our courts have long favored a position that presumed the payment of consideration for corporation stock and have reached far to recognize that payment. In fact, in Succession of Quaglino, 232 La. 870, 95 So.2d 481 (1957), when the court was faced with a question of whether two sons paid their father for their two shares in the family corporation, the court stated, "We can draw no other conclusion than that when the corporation was formed in 1937, the two shares of stock were issued to each of the sons by their father for services rendered over a long period of time." We will not conjecture the possibilities that would enable us to clothe the issuance of certificate no. 4 with the necessary consideration, but it will suffice for us to note that they are present and, importantly, plaintiffs have done little to denigrate any of those possibilities even though they carry the burden in this matter.
We note that the genuineness of the signatures on certificate no. 4 are admitted by plaintiffs to be genuine and the directors' meeting at which it was issued is likewisenot contested by plaintiffs.
The trial court erred in not placing the burden of proof on the plaintiffs to show that certificate no. 4 was issued without consideration. This court does and, accordingly, we find they have failed to carry that burden and we must recognize that certificate no. 4 was validly issued to Albert, Jr.
*320 Even with that conclusion, however, we now undertake consideration of plaintiffs' assignment of error that the trial court should not have ruled that defendants acquired by prescription certificate no. 4 and the 46 shares of Thornton Farms, Inc. issued on July 21, 1965.
The trial court ruled that although certificate no. 4 was issued without consideration, ownership thereof was perfected by the lapse of nineteen years since the issuance of the certificate. The defendants agree with the trial court but the plaintiffs argue that, if the original issuance was void, then regardless of the length of time it was possessed by Albert, Jr. and his heirs, acquisitive prescription cannot apply.
At the time of issuance of certificate no. 4 on July 21, 1965, Article 13, § 2 of the Louisiana Constitution of 1921 was effective. The article reads:
"Corporations shall not issue stock or bonds except for labor done, or money or property actually received; and all fictitious issues of stock shall be void; and any corporation issuing such fictitious stock shall forfeit its charter."
This article forms the foundation for the plaintiffs' argument that if the stock was unpaid, the issuance formed an absolute nullity which is not susceptible to prescription.
Plaintiffs overstate the positions of the jurisprudence in passing on the rights of prescription as they affect nullities. It is not correct to state that the issuance of stock without consideration is a nullity which cuts off all possibilities of prescription. There is a difference between a nullity which clothes with imprescriptibility an immoral or illicit act which harms society in general and a nullity which operates to protect private parties such as those who are stockholders in a corporation.
An example of that difference in favor of prescription is found in Whitney National Bank of New Orleans v. Schwob, 203 La. 175, 13 So.2d 782 (1943), where the court found that the transfer of property by a minor was "absolutely null," but that the property itself could nonetheless be acquired by the transferee by acquisitive prescription. The same result was reached in the case of an "absolute nullity" involving a donation when the court held the property was subject to acquisitive prescription. Givens v. Givens, 273 So.2d 863 (La.App. 2 Cir.1973), writ denied, 275 So.2d 868 (La. 1973).
Where all the stockholders sign an affidavit acknowledging each other's stock ownership in the corporation, as they did in this case, they ratify the stock issuance. When the three stockholders executed the affidavit for the Calcasieu Marine National Bank which accounted for Albert, Jr. owning certificate no. 4, clearly the transferee is recognized in possession of the certificate and the 46 shares it represents and such possession makes it subject to acquisitive prescription by the holder even if no consideration was originally paid. Possession of the certificate after the affidavit was open and notorious and subject to acquisitive prescription.
The affidavit in 1966 acknowledging the ownership by Albert, Jr. of certificate no. 4 ratified its issuance and plaintiffs cannot now assert a bar to acquisitive prescription in favor of the possessor and his heirs.
La.C.C. Article 3490 provides:
"One who has possessed a movable as owner, in good faith, under an act sufficient to transfer ownership, and without interruption for three years, acquires ownership by prescription."
La.C.C. Article 3491 provides:
"One who has possessed a movable as owner for ten years acquires ownership by prescription. Neither title nor good faith is required for this prescription."
La.C.C. Article 473 provides:
"`Shares in entities possession juridical personality' are movables. Therefore, corporation stock is a movable and subject to the acquisitive prescriptions of three years and ten years as set out in the Civil Code."
Acquiring stock through acquisitive prescription of the issued stock certificate is not new to our law and it is rooted in the prevailing jurisprudence of our state.
*321 In De St. Romes v. Levee Steam Press Co., 31 La.Ann. 224 (1879), the court was dealing with a person to whom a stock certificate for 36 shares had been transferred in 1853. The court held that, "Three years in good faith except where the thing is lost or stolen, gives a prescriptive title to movables." There, the court held that defendant's title to the certificate was valid by virtue of either three years or ten years acquisitive prescription.
In State v. J. S. Waterman & Co., 178 La. 340, 151 So. 422 (1933), the Supreme Court reached the same conclusion as in De St. Romes, despite the plaintiff's position that the stock was issued without consideration and was null ab initio. The stock was held to be subject to ownership by acquisitive prescription of three years or ten years. That is still the ruling jurisprudence in this state by which we are bound. It was followed again in Reuter v. Reuter's Succession, 206 La. 474, 19 So.2d 209 (1944), though there, the court found acquisitive prescription inapplicable because there was no possession of the stock certificates as owner.
In maintaining the defendants' plea of prescription, the trial judge in the case sub judice stated:
"Under our law all private things are susceptible of acquisitive prescription unless prescription is excluded by provision of law. See Civil Code Article 3485 and former Article 3497. Common and public things may not be acquired by prescription nor may private things that the legislature has specifically excluded from acquisitive prescription. There is no legislation which excludes shares of stock from acquisition by prescription.
Acquisitive prescription applies to both movables and immovables. Ownership rights in movables may be acquired in three or ten years. See Civil Code Articles 3489, 3490 and 3491, as well as former Articles 3476, 3506 and 3509.
Shares of corporate stock are classified as incorporeal movables. Civil Code Article 473 and former Article 474. It was long ago held by the Supreme Court of Louisiana in De St. Romes vs. Levee Steam Cotton Press Company, 31 La. Ann. 224 (1879), that ownership of shares in a corporation can be acquired by acquisitive prescription of three or ten years. In a later case, State vs. J.S. Waterman and Co., 178 La. 340, 151 So. 422 (1933), the Supreme Court went further and specifically recognized that corporate stock which had been issued without consideration could be acquired by acquisitive prescription of three or ten years. That holding was referred to and recognized in Reuter vs. Reuter's Succession, 206 La. 474, 19 So.2d 109 (1944)."
Plaintiffs cite Mackie Pine Products Co. v. Frederick, 148 La. 687, 87 So. 712 (1921) and Gentilly Land Co. v. Crawford, 225 La. 837, 74 So.2d 47 (1954), in support of their argument that stock issued without consideration is void. In those cases, the stock was issued without consideration and was carried on the corporation's books as an open account or accounts receivable. In both of those cases, because the corporation's books clearly indicated the stock had not been paid for, the shares were void. Mackie and Gentilly Land are to be distinguished from the facts at hand for two reasons. First, the records of Thornton Farms, Inc. that remain, i.e., the federal and state income tax returns, do not reflect the carrying of the disputed 46 shares as an open account, but rather as issued and outstanding shares (thus presumably paid for). Secondly, prescription was not an issue in either Mackie or Gentilly as it is in the appeal at hand.
Plaintiffs have cited in brief cases which deal with the bar to prescription. But in those cases the courts considered liberative prescription which is not applicable here where the issue is acquisitive prescription. We therefore distinguish those cases from the matter at bar.
Clearly, Waterman and De St. Romes are on point for the facts at hand. The heirs of Albert, Jr. possessed and owned the 46 shares from his death in 1971 to the filing of the suit by the plaintiffs in 1984. Before that, Albert, Jr. possessed the 46 shares from 1965 to his death in 1971. The *322 facts do not substantiate any other possession other than that of good faith by either Albert, Jr. or his heirs. Under this condition, Albert, Jr. acquired ownership under three years acquisitive prescription because he held certificate no. 4 in good faith and just title. If, on the other hand, we were to adopt the assumption of bad faith possession, the heirs of Albert, Jr. acquired ownership under ten years acquisitive prescription. Nothing interrupted the possession. In either instance, good faith or bad faith, the result is the same and Albert, Jr. and his heirs are the valid owners of certificate no. 4 and the trial court correctly reached that conclusion.
For the reasons assigned, the judgment of the trial court is affirmed. The costs of this appeal are assessed to plaintiffs-appellants.
AFFIRMED.
DOMENGEAUX, J., concurs merely to point out that he considers that Smith v. Smith is not in conflict with this case, but in any event is distinguished.
NOTES
[*] Judge Edmund M. Reggie, Retired, participated in this decision as Judge Pro Tempore by appointment of the Louisiana Supreme Court.